OPINION OF THE COURT
Eugene P. Bambrick, J.
This is a motion by the plaintiff herein, the District Attorney of Queens County, pursuant to the recently enacted CPLR article 13-A, entitled "Proceeds of a Crime — Forfeiture”, for a preliminary injunction enjoining the defendants Ellen McAuliffe and Charles Ott, pending the determination of this forfeiture action, from selling, giving, transferring, pledging, mortgaging or otherwise alienating or encumbering their right, title and interest or any part thereof in certain parcels of real property located in Monroe County, Pennsylvania, which were allegedly purchased by the defendants with the "proceeds of a crime”.
The announced purpose of CPLR article 13-A (first enacted by L 1983, ch 1017, eff Mar. 1, 1984, later repealed, and present art 13-A added by L 1984, ch 669, eff Aug. 1, 1984) was to authorize civil forfeiture actions by the District Attorneys and the Attorney-General, as claiming authorities, to recover real property, personal property, money, negotiable instruments, securities or other items of value which constitute the proceeds of a crime, and to, in effect, "take the profit out of crime”. (See, Governor’s approval memorandum, 1984 McKinney’s Session Laws of NY, at 3627, 3628.)
It is in this capacity, as a "claiming authority”, pursuant to CPLR 1310 (11) that the plaintiff District Attorney has commenced the within forfeiture action by service upon the defendants of a "summons with notice”, in accordance with CPLR 1311 (5), and is requesting herein the provisional remedy of preliminary injunction, as set forth in CPLR 1312 and 1333, to enjoin the sale of real property located in Pennsylvania.
A. UNDERLYING FACTS
The underlying facts in this case have been presented in affidavits annexed to the moving papers by Assistant District Attorney David R. Sherman and Detective Joseph Favuzzi of the Crimes Against Senior Citizens Squad for Queens County, along with written evidence, in accordance with CPLR 1334. These uncontroverted affidavits may be summarized as follows: One, Margaret Burnham, an 84-year-old widow, resided *418 alone in an apartment wherein she was being cared for by the defendant Ellen McAuliffe, a nurse, who was living with the codefendant Charles Ott, the superinténdent of the building. It appears that the defendants gained the trust and confidence of Mrs. Burnham, and convinced her that a third party had taken a "contract” on her life, whereby she was to be murdered for a fee. The defendants told Mrs. Burnham that if she would pay them the money that would go to the prospective murderer, they, in turn, would pay off the contract, thereby sparing her life. Believing this to be true, Mrs. Burnham wrote a series of 16 checks to the order of defendant McAuliffe between the period of January 29, 1985 and March 4, 1985, in the aggregate sum of $154,500, which defendant McAuliffe deposited in her bank account (No. 18446051) with Citibank, N. A., located at 1285 First Avenue, New York, New York. The original canceled checks were obtained from defendant McAuliffe’s pocketbook at the time of her arrest, and copies of these checks were annexed to the moving papers.
It appears that the defendants employed the use of terror tactics to accomplish the coercion of Mrs. Burnham, in that at least on one occasion defendant Ott, disguised and masked, entered the Burnham apartment posing as the would-be murderer, threatened her life in defendant McAuliffe’s presence, and demanded additional payments.
It further appears that on or about May 19, 1985, Mrs. Burnham sustained severe injuries causing her to be hospitalized from a "fall” down a dumbwaiter shaft in her apartment, which occurred under suspicious circumstances. On that date, a male armed with a pistol, wearing a blue jacket and a mask, gained access to the Burnham apartment. He placed an artificial penis on a table and told Mrs. Burnham that this is what he did to people he didn’t like. Thereupon, he forced Mrs. Burnham at gunpoint to write out and sign a suicide note. He then pushed Mrs. Burnham, who fell and cut her head. Thereafter, the intruder threw Mrs. Burnham down the dumbwaiter shaft, causing her to fall approximately two stories.
Subsequently, pursuant to a search warrant, the police recovered a pistol, an artificial penis, and a blue jacket stained with what appeared to be blood from the defendants’ apartment.
Based upon an investigation of the foregoing facts, which included interviews with Mrs. Burnham at the hospital on *419 four separate occasions, Detective Favuzzi arrested the defendants on June 5, 1985. The defendants were indicted under indictment No. 2887/85 for the following crimes: attempted murder in the second degree; assault in the first degree (two counts); grand larceny in the first degree by extortion; grand larceny in the second degree (17 counts); criminal possession of stolen property in the second degree; coercion in the second degree; and conspiracy in the fourth degree.
B. THE REAL PROPERTY IN PENNSYLVANIA— "SUBSTITUTED PROCEEDS OF A CRIME”
During the course of the investigation, defendant McAuliffe made a statement to the effect that she had purchased parcels of real property in the Poconos. It appears that on or about February 17, 1985, $16,035 of the $154,500 extorted from Mrs. Burnham was used by defendants to purchase a parcel of vacant land known as lot No. 5491, section C3B, Clearview Road, Emerald Lakes, Long Pond, Monroe County, Pennsylvania, which parcel was purchased in the name of defendants Charles Ott and Ellen McAuliffe. Subsequently, on or about March 23, 1985, $46,000 of the $154,500 extorted from Mrs. Burnham was used by defendants to purchase an improved parcel of land known as lot No. 7046, section Dl, Long Pond Road, Emerald Lakes, Long Pond, Monroe County, Pennsylvania. Title to this parcel was taken solely in the name of defendant McAuliffe.
It appears that both parcels of land were paid for out of the Citibank account of the defendant McAuliffe previously mentioned. Said bank account records were subpoenaed and annexed to the moving papers. On January 29, 1985 the records indicate a balance of $1,665.07. The parcels of land were purchased subsequent to the deposits of the Burnham checks in defendant McAuliffe’s account.
It would appear to this court that the real property purchased with a total of $62,035 of extorted money represents "substituted proceeds of a crime” under CPLR 1310 (3), and is forfeitable to a claiming authority pursuant to CPLR 1311 (1).
C. "POST-CONVICTION FORFEITURE CRIME”
The crimes upon which a forfeiture action may be based are divided into two types, pursuant to the nomenclature of CPLR article 13-A, as follows:
*420 (1) CPLR 1310 (5) defines "post-conviction forfeiture crime” to mean any felony defined in the Penal Law or any other chapter of the consolidated laws of the State; and
(II) CPLR 1310 (6) defines "pre-conviction forfeiture crime” to mean only a felony defined in Penal Law article 220 or Penal Law §§ 221.30 or 221.55 which are essentially drug-related crimes.
The main distinction between the two types of forfeiture crimes is that in the case of a "pre-conviction forfeiture crime”, the forfeiture action need not be based on conviction for the crime, and is meant to be a more effective tool in the battle against drug traflicking.
The defendants herein have been indicted for crimes which fit into the category of "post-conviction forfeiture crimes”. Although this court may not grant forfeiture in this matter until conviction has occurred, a forfeiture action may be commenced, and one of the provisional remedies provided under article 13-A may be granted, prior to any conviction having occurred. (See, CPLR 1311 [1] [a].)
D. THE PROVISIONAL REMEDY OF PRELIMINARY INJUNCTION UNDER CPLR ARTICLE 13-A
As stated, the plaintiff "claiming authority” has requested herein the provisional remedy of a preliminary injunction enjoining the defendants from disposing of certain parcels of real'property located in Pennsylvania which as "substituted proceeds of a crime” are subject to forfeiture. CPLR 1333 provides as follows: "A preliminary injunction may be granted in any action under this article, whether for money damages or otherwise, where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the claiming authority’s rights respecting the subject of the action, and thereby tending to render a resulting judgment ineffectual.”
Additionally, in order to obtain a preliminary injunction, under CPLR 1334 the claiming authority must show grounds for relief as required by CPLR 1312 (3), which provides: "A court may grant an application for a provisional remedy when it determines that: (a) there is a substantial probability that the claiming authority will prevail on the issue of forfeiture and that failure to enter the order may result in the property being destroyed, removed from the jurisdiction of the court, or otherwise be unavailable for forfeiture; and (b) the need to *421 preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order may operate.”
The plaintiff submits that in order to preserve the availability of the two parcels of realty in Pennsylvania for forfeiture, a preliminary injunction is necessary.
E. LIKELIHOOD OF SUCCESS
This court finds that given the circumstances of this case, there is a substantial probability that the claiming authority will prevail on the issue of forfeiture. In arriving at this conclusion, the court has considered, inter alia, the evidence to be introduced at a criminal trial on grand larceny charges against the defendants, which the claiming authority already has at its disposal: Margaret Burnham’s testimony that the money was extorted from her, as detailed in Detective Favuzzi’s affidavit; the 16 checks taken from defendant McAuliffe at the time of her arrest; the bank account records of defendant McAuliffe, showing the deposits in the amount of $154,500; the testimony of Detective Favuzzi as to the results of the investigation conducted by his squad; a pistol, an artificial penis, and a blue jacket stained with what appeared to be blood found in defendants’ apartment, pursuant to a search warrant. Furthermore, the court has noted that Detective Favuzzi has stated in his affidavit that defendant McAuliffe admitted that she purchased both parcels of realty with the money received from Mrs. Burnham, and that prior to her receipt of any money from Mrs. Burnham, defendant McAuliffe’s bank balance totaled only $1,665.07. It would appear to this court that the claiming authority would probably be able to meet its burden of proving by a "preponderance of the evidence” the facts necessary to establish a claim for forfeiture. (See, CPLR 1311 [3] [a].)
F. FAILURE TO ENTER THE ORDER MAY RESULT IN THE PROPERTY BEING MADE UNAVAILABLE FOR FORFEITURE, THEREBY TENDING TO RENDER A RESULTING JUDGMENT INEFFECTUAL
In the case of the Pennsylvania properties, it is the opinion of this court that the defendants attempted to insulate these assets from the jurisdiction of the court. Failure to grant a preliminary injunction against the transfer or encumbrance of title to the two Pennsylvania parcels may result in the properties being rendered absolutely unavailable for forfei *422 ture. There is evidence that the $154,500 sum extorted by defendants from Mrs. Burnham has been squandered and reduced to $27,537.96 in cash, and two parcels of land having a value of approximately $62,000. In this regard, given the $1,665.07 bank balance of defendant McAuliffe prior to the extortion, it is not unreasonable to conclude that defendants are in desperate need of funds. There is the distinct possibility that the defendants, short of money in their own right, might sell the properties in order to pay legal fees they will incur in defending themselves against the serious crimes with which they have been charged, or in order to post bail. It is the opinion of this court that if the defendants are not prevented from selling the Pennsylvania realty, said property would not be preserved for forfeiture, thereby rendering judgment of forfeiture ineffectual.
G. EXTRATERRITORALITY: IN REM VERSUS IN PERSONAM
The question remains: Does a New York court have the power in a forfeiture order, pursuant to CPLR article 13-A, to direct a defendant to dispose of property in Pennsylvania in order to satisfy a forfeiture judgment? In the same vein, does a New York court have the power on a motion for a preliminary injunction to issue a decree that restrains or orders the commission of acts or affects property in Pennsylvania? (See, 7A Weinstein-Korn-Miller, NY Civ Prac ¶ 6301.26, at 63-89.)
In order to answer this query in this matter, it is important to comprehend the historical roots and different types of forfeiture. Historically, forfeiture proceedings have been divided into two types — in rem and in personam. (See, 2A Weinstein-Korn-Miller, NY Civ Prac ¶ 1311.02, at 13-A-22.) In rem forfeiture, which has as its object the "offending” property, is derived from the idea that chattels attain some guilt in the criminal act. (See, Note, Forfeiture of Property Used in Connection with Criminal Acts, 25 Wayne L Rev 83.) Thus, in biblical times, a "goring ox” that killed a person was slain and its flesh could not be eaten because of the injury the animal had caused. As it is written: "If an ox gore a man or a woman, that they die: then the ox shall be surely stoned, and his flesh shall not be eaten”. (Exodus 21:28.) This carried over to early English common law where a chattel that caused the death of a person was forfeited to the Crown, which used the property to provide relief to the dependents of the deceased or for other charitable purposes. (1 Blackstone, Commentaries, ch 8 [17th *423 ed 1830]; 2 Pollack & Maitland, History of English Law, at 273 [2d ed 1898]; see also, Finkelstein, The Goring Ox: Some Historical Perspectives on Deodands, Forfeitures, Wrongful Death and the Western Notion of Sovereignty, 46 Temple LQ 169.) This forfeiture action, known as deodand, was essentially in rem, being brought against the object, not the owner, and the guilt or innocence of the owner was irrelevant. " 'Where a man killeth another with the sword of John at Stile, the sword shall be forfeit as deodand, and yet no default is in the owner.’ ” (Holmes, The Common Law, at 23-26 [1881], quoting Doctor and Student, dialectic 2, ch 51.) Although the institution of deodand never became a part of the American common-law tradition, statutes providing for the forfeiture of commodities and vessels used in violation of . customs and revenue laws were adopted at an early date in the country’s history. (See, Calero — Toledo v Pearson Yacht Leasing Co., 416 US 663, 682-684.) Numerous Federal and State in rem forfeiture laws are currently in force and have expanded the scope of forfeiture to include virtually any type of property that may be used in a criminal activity. (See, Hughes & O’Connell, In Personam [Criminal] Forfeiture and Federal Drug Felonies: An Expansion of a Harsh English Tradition into a Modern Dilemma, 11 [Part 2] Pepperdine L Rev 613, 618, n 30.)
The other type of forfeiture, in personam forfeiture, in which the estate of the person was forfeited, arose in medieval England as a punishment for convicted felons. (See, 2A Weinstein-Korn-Miller, NY Civ Prac ¶ 1311.02, at 13-A-24.) Such forfeitures were significantly circumscribed by the Magna Carta and were completely abolished in England by the 19th century. (See, Taylor, Forfeiture under 18 U.S.C. § 1963 — RICO’s Most Powerful Weapon, 17 Am Crim L Rev 379, 381-382.) US Constitution, article III, § 3 specifically prohibited forfeiture of estate for a felony, with the exception of the forfeiture of the property of a convicted traitor during the traitor’s lifetime. A limited revival of in personam forfeiture occurred with the enactment of Organized Crime Control Act of 1970 title IX, "Racketeer Influenced and Corrupt Organizations” (RICO; 18 USC §§ 1961-1968). As part of a concerted effort to counter organized crime’s corruption of legitimate business, RICO authorized the court to order a forfeiture of the convicted racketeer’s interest in the victimized business (18 USC § 1963). A more expanded version of in personam forfeiture was authorized by the Controlled Substances Act of 1970 (21 USC § 801 et seq.) under which persons convicted of engaging *424 in a continuing criminal enterprise (CCE), as defined by the statute, may be ordered to forfeit the proceeds derived from their criminal activity (21 USC § 848).
Whether a forfeiture action will be an action in rem or in personam is clearly a matter of legislative discretion. (See, United States v Stowell, 133 US 1; see also, Goldsmith-Grant Co. v United States, 254 US 505; State v Peterson, 201 Wis 20, 229 NW 48.) The New York State Legislature was unequivocal in its designation of the CPLR article 13-A Civil Forfeiture Act as being in personam in nature: "Any action under this article must be commenced within five years of the commission of the crime and shall be civil, remedial, and in personam in nature and shall not be deemed to be a penalty or criminal forfeiture for any purpose”. (CPLR 1311 [1].) To the extent that an article 13-A forfeiture is in personam and is based on the defendant’s criminal activity, it provides the prosecuting authority with the flexibility of seeking forfeiture of any of the criminal defendant’s assets which are proceeds or substituted proceeds of a crime once the amount of the gain from the criminal activity is established.
In answer to the query herein regarding the extraterritorial powers of the court, in a forfeiture order, the following seems to be right on point: "Because the forfeiture action is in personam, the court would also appear to have the power, in the forfeiture order, to direct a defendant to dispose of property outside the state in order to satisfy the judgment”. (2A Weinstein-Korn-Miller, NY Civ Prac ¶ 1311.08, at 13-A-34.) This in personam phenomenon was explained in Fall v Eastin (215 US 1, 11-12), as follows: "[WJhen the subject-matter of a suit in a court of equity is within another State or country, but the parties within the jurisdiction of the court, the suit may be maintained and remedies granted which may directly affect and operate upon the person of the defendant and not upon the subject-matter, although the subject-matter is referred to in the decree, and the defendant is ordered to do or refrain from certain acts toward it, and it is thus ultimately but indirectly affected by the relief granted. In such case the decree is not of itself legal title, nor does it transfer the legal title. It must be executed by the party, and obedience is compelled by proceedings in the nature of contempt, attachment or sequestration. On the other hand, where the suit is strictly local, the subject-matter is specific property, and the relief when granted, is such that it must act directly upon the subject-matter, and not upon the person of the defendant, the *425 jurisdiction must be exercised in the State where the subject-matter is situated.” (See, Messner, The Jurisdiction of a Court of Equity over Persons to Compel the Doing of Acts Outside the Territorial Limits of the State, 14 Minn L Rev 494, 506-509; Restatement [Second] of Conflict of Laws § 53, at 183; see also, 7A Weinstein-Korn-Miller, NY Civ Prac ¶ 6301.26, at 63-93, nn 232, 233.)
It is the opinion of this court that since the forfeiture action herein is in personam, the court would have the power on a motion for preliminary injunction to issue a decree that restrains or orders the commission of acts or affects property outside the State, as a provisional remedy. To the extent that the following statement is contrary to this holding, this court is not in agreement with it: "The court would not appear to have this power with respect to the granting of provisional remedies, however, since one of the assumptions underlying the necessity for a provisional remedy is that the próperty is within the jurisdiction of the court and that some action is necessary in order to prevent its removal. See CPLR 1312, subdivision 3 (a).” (2A Weinstein-Korn-Miller, NY Civ Prac ¶ 1311.08, at 13-A-34, 13-A-35.)
This court interprets CPLR 1312 (3) (a), which provides "that failure to enter the order may result in the property being destroyed, removed from the jurisdiction of the court, or otherwise be unavailable for forfeiture” (emphasis added) as explicitly including other eventualities besides the possible removal of the property from the jurisdiction of the court, as being a basis for the granting of a provisional remedy; such as the situation herein, where the properties in Pennsylvania might "otherwise be unavailable for forfeiture”. In fact, the same text seems to reverse itself in another section, and makes the following statement which this court fully indorses, regarding the specific provisional remedy of a preliminary injunction, and which is the specific subject matter herein: "Inasmuch as the claiming authority apparently may seek the forfeiture of property located outside the state, see ¶ 1311.07 [sic, should be ¶ 1311.08], the question arises as to whether a preliminary injunction may be secured with respect to that property. Although New York courts have the power to enjoin conduct affecting property outside the state, they have been reluctant to exercise this power. See ¶ 6301.26. Assuming however, that a court has the power to order the forfeiture and subsequent disposition of property located outside the state, it may be presumed that it would exercise its power to *426 enjoin the defendant’s conduct with respect to that property pending the outcome of the forfeiture action”. (2A Weinstein-Korn-Miller, NY Civ Prac ¶ 1333.04, at 13-A-86, 13-A-87.)
Accordingly, this court finds that the failure to grant in personam relief herein in the form of a preliminary injunction against the transfer or encumbrance of title to the two Pennsylvania parcels may result in the properties being rendered absolutely unavailable for forfeiture.
H. BALANCING OF THE EQUITIES
It is the finding of this court that the need to preserve the properties purchased with Mrs. Burnham’s money far outweighs the hardship on any party against whom the injunction might operate. Irreparable damage to Mrs. Burnham will result if the assets are not preserved for forfeiture, pursuant to CPLR article 13-A. The property will remain intact and available to defendants in the unlikely event that the claiming authority is unsuccessful. Therefore, if there is any hardship, it is minimal.
I. CONCLUSION
For all the foregoing reasons, the motion by the claiming authority, plaintiff District Attorney of Queens County, for a preliminary injunction is granted.
It is to be noted that such provisions as CPLR 6312 (b) concerning the necessity of furnishing an undertaking have not been included in CPLR article 13-A, since forfeiture actions will always be brought by the Attorney-General or a District Attorney, or by a Corporation Counsel or County Attorney, acting with their consent, and, as public officers acting on behalf of the State, they are excluded by CPLR 2512 from any provision of law authorizing or requiring an undertaking.
Finally, this court wishes to acknowledge Assistant District Attorney David R. Sherman of the Special Proceedings Bureau, and Assistant District Attorney David S. Zadnoff of the Civil Forfeiture Unit for their comprehensive research in this matter.